## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## DOTHAN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 16-10013 |
| SPECALLOY CORPORATION, | ) | |
| | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| WILLIAM C. CARN, III, Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 18-_____ |
| | ) | |
| v. | ) | |
| | ) | |
| LYLE PELUSO, JR., WAYNE RATNER, MEAGHAN PELUSO, MICKEY CHRISTO, and PANHANDLE EMPLOYMENT AGENCY, LLC, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT

William C. Carn, III, as Chapter 7 Trustee (the "Trustee") for SpecAlloy Corporation, files this Complaint (the "Complaint") against the above-captioned defendants (collectively, the "Defendants"), and in support thereof, respectfully shows as follows.

## INTRODUCTION

1.      SpecAlloy operated and managed a catalytic converter recycling business which would purchase used catalytic converters and, in turn, sell materials extracted from those converters to one or more refiners.  Before collapsing into bankruptcy in 2016, SpecAlloy became insolvent due to the Defendants' negligence and malfeasance.

2.      Each of the Defendants is a former officer, director and/or other principal of SpecAlloy Corporation ("SpecAlloy" or the "Debtor"), or received avoidable transfers from SpecAlloy.

3.      Defendants Lyle Peluso, Jr. ("Peluso") and Wayne Ratner ("Ratner", and collectively with Peluso, the "Director and Officer Defendants") were responsible for acts of considerable mismanagement which included, among other things, increased overhead, risky unsecured loans to converter suppliers, and the failure to impose and maintain the internal controls necessary to accurately count the company's inventory.

4.      For example, while SpecAlloy was losing money and approaching its demise, the Director and Officer Defendants paid themselves lavish salaries and benefits, and used SpecAlloy's funds to pay personal expenses such as home mortgage and automobile payments, monthly cellphone service, school tuition for children, personal vacations, dividends, bonuses, personal income tax payments, payments to relatives, and salary advances.

5.      Further, the Director and Officer Defendants caused SpecAlloy to make unsecured advances of credit to various suppliers without any effective means of recovery, which ultimately resulted in disastrous losses for SpecAlloy due to the inability of SpecAlloy to collect amounts owed.

6.      Further, the Director and Officer Defendants either failed to take inventory for months on end in 2015 or took inventory in a negligent manner that led to the submission of inaccurate financial reports.  This failure, coupled with a poorly-implemented inventory tracking system and the failure of an accounting firm to properly recognize these problems, led to the overstating of inventory, and in turn caused SpecAlloy to incur more and more debt, thereby harming the company and its creditors.

7.     The Director and Officer Defendants also failed to maintain the necessary internal controls to monitor the financial performance of SpecAlloy and its subsidiaries.

8.     Due to actions and inactions of the Defendants,[1] SpecAlloy and its creditors were harmed.  The Trustee files this suit to recover for the damages caused by the Defendants.

## PARTIES

9.     SpecAlloy is a Florida corporation which was based in Dothan, Alabama.

10.     Peluso is a resident of the State of Alabama and can be served at 509 Riveredge Parkway, Dothan, Alabama  36303.

11.     Meaghan Peluso ("Ms. Peluso") is a resident of the State of Alabama and can be served at 509 Riveredge Parkway, Dothan, Alabama  36303.

12.     Ratner is a resident of the State of Rhode Island and can be served at 28 Cedarwood Lane, Hope Valley, RI 02832-2305.

13.     Mickey Christo ("Christo") is a former employee of SpecAlloy, and can be served at 20 California Ave., Carpentersville, IL 60110.

14.     Peluso and Ratner were insiders of the Debtors, as defined under section 101 of the Bankruptcy Code and other applicable law, at all times relevant to this Complaint.

15.     Panhandle Employment Agency, LLC ("Agency") is an Alabama limited liability company.  Agency was dissolved by Donovan in March of 2017 and is included in this litigation as it was an entity through which funds flowed from SpecAlloy to certain of the Defendants and others.  Agency can be served with process via its manager, Donovan, at 110 Breckenridge Lane, Dothan, AL 36303.

---

[1]  SpecAlloy's former chief executive officer and director, Joseph Donovan ("Donovan"), filed a chapter 7 bankruptcy case in the U.S. Bankruptcy Court for the Middle District of Alabama, Dothan Division, Case No. 16-10718 after the filing of SpecAlloy's bankruptcy case.  The Trustee filed a proof of claim in Donovan's bankruptcy case and received a recovery from his estate.

-3-

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1331, and 1334 because this is a civil proceeding arising under the Bankruptcy Code, or arising in or related to SpecAlloy's bankruptcy estate.

17.     This is a core proceeding within the meaning of 28 U.S.C. § 157.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) because this is where SpecAlloy's bankruptcy case is pending.

## FACTUAL BACKGROUND

### Overview of SpecAlloy

19.     Donovan founded SpecAlloy as a recycling business in 1998 and began specializing in recycling catalytic converters ("Converters") in 1999 or 2000.

20.     SpecAlloy collected and processed Converters, and sold certain extracted materials to refiners.

21.     In the last few years of its existence, SpecAlloy and its insiders formed a number of affiliated entities (the "Affiliates") for various purposes, such as sourcing Converters from different markets. The Affiliates were formed as separate entities on the advice of SpecAlloy's outside accountant and business consultant, Gerry Travis ("Travis") with Cooke, Cameron, Travis & Company, P.C.

22.     SpecAlloy operated continuously until early 2016, when, due in large part to the actions and inactions of the Defendants, it was forced to cease doing business.

23.     On January 5, 2016 (the "Petition Date"), SpecAlloy filed a chapter 11 bankruptcy case in the U.S. Bankruptcy Court for the Middle District of Alabama, Dothan Division (the "Bankruptcy Court"), which was later converted to a chapter 7 case (the

-4-

"Bankruptcy Case").

**Directors and Officers**

24.     Donovan served as SpecAlloy's Chief Executive Officer from SpecAlloy's founding in 1998 through early 2016.

25.     Peluso began working for SpecAlloy in late 2010 or early 2011 as its Information Technology Manager. In 2011, Peluso was promoted to Chief Information Officer and Chief Operations Officer. In mid-2014, Peluso was promoted to President. Peluso remained in that position until October 2015.  As President of SpecAlloy, Peluso had control over the Debtor's affairs.

26.     Peluso hired Cecil Tony Sanders ("Sanders") as Controller and began working for SpecAlloy in 2011.  About a year later, Sanders was promoted to Chief Financial Officer. Sanders remained in that position until December 2015.

27.     Peluso, Sanders, and Donovan were members of SpecAlloy's board of directors at all times relevant to this Complaint.

28.     Following Peluso's promotion to President of SpecAlloy in 2014, he was the primary person responsible for daily operations. From that point until mid-2015, Donovan was not involved in daily operations.

29.     Despite the fact that both Peluso and Sanders were on SpecAlloy's board of directors and were officers of the company, Peluso controlled Sanders (who reported to Peluso, rather than Donovan) and threatened to fire Sanders on multiple occasions if Sanders did not comply with Peluso's orders.

30.     SpecAlloy's dysfunctional organizational structure, coupled with the failings of its directors and officers, ultimately led to the downfall of the company.

-5-

**Relationship with Heesung**[2]

31.    Originally, SpecAlloy sold materials to multiple refiners, including Heesung PMTech Corporation ("Heesung").  But in the few years leading up to the Petition Date, SpecAlloy's relationship with Heesung grew increasingly more exclusive.

32.    In 2013, Heesung devised a plan whereby it would fund SpecAlloy's growth by providing capital infusions that would be recorded, with little if any legal documentation, as advances for purchasing Converters.  The purpose of this arrangement was for SpecAlloy to grow and feed Heesung's increasing appetite for more and more Converters.  Peluso, Donovan, and Sanders agreed or acquiesced to this *de facto* partnership with Heesung to the ultimate detriment of SpecAlloy and its creditors.

33.    By mid-2015, Heesung had overwhelmingly become SpecAlloy's largest customer, and exerted control over SpecAlloy.  Heesung accounted for about 95% of SpecAlloy's revenues.  At that point, any interruption in funding from Heesung would have threatened SpecAlloy's ability to continue operating.

34.    In consideration for Heesung's investment in SpecAlloy and in recognition of its power over SpecAlloy, SpecAlloy's directors and officers agreed to sell materials to Heesung at prices significantly below those that SpecAlloy could receive from other refiners.

35.    In or around July 2015, after an inventory shortage was discovered, Heesung effectively took control of SpecAlloy and ran SpecAlloy for its benefit for several months as it extracted all it could from the increasingly insolvent SpecAlloy.  This was done to the detriment of SpecAlloy's arms' length creditors, such as Wells Fargo Bank, Regions Bank, various vendors and taxing authorities, and SpecAlloy's employees.  After harvesting all it could from the empty

---

[2] The Trustee has filed a separate lawsuit against Heesung seeking, among other things, the avoidance and recovery of transfers made during the pre-bankruptcy period.  Nothing in this Complaint is intended to excuse Heesung from liability in that litigation.

-6-

husk of SpecAlloy, Heesung abruptly terminated the relationship in December 2015, right after seizing metals supplied by SpecAlloy and refusing to pay for them.

36.     SpecAlloy's directors and officers were complicit in Heesung's seizure of control of SpecAlloy and put their own personal needs and the needs of Heesung (which was an insider of SpecAlloy due to its unusual level of control) ahead of the needs of SpecAlloy and its arms' length creditors.

**Inaccurate Financial Reporting**

37.     During 2014 and 2015, Peluso, Donovan, and Sanders failed to implement proper internal controls and failed to properly inform themselves of the true financial performance of SpecAlloy and its Affiliates.

38.     Sanders, who reported to Peluso, was responsible for SpecAlloy's financial reporting, which was also overseen by Travis, who failed to properly exercise the appropriate standard of care.

39.     Sanders provided monthly financial reports to Peluso but did not provide them to Donovan, who did not even know how much SpecAlloy was generating in revenue without reference to such financial reports.

40.     Peluso did not question the financial reports that he received or challenge any of the assumptions upon which they were based; he just assumed they were accurate.  Peluso used these reports to set his own compensation and the compensation of Donovan and Sanders.

41.     In fact, the financial reports were inaccurate.

42.     Among other issues, funds and assets were being shifted between SpecAlloy and the Affiliates, and the financial performance, assets, and liabilities of the Affiliates were not being reported in an accurate manner.

43.     No accurate consolidated financial statements for SpecAlloy and the Affiliates were prepared by Peluso, Sanders, Travis, Ratner, or any other person.

44.     Travis was specifically tasked with overseeing the accuracy of SpecAlloy's financial reporting yet he failed to do so.

45.     Accordingly, the Director and Officer Defendants did not apprise themselves of critical information necessary to properly run SpecAlloy, leading to disastrous results for the company and its creditors.

**Inaccurate Inventory Reporting**

46.     SpecAlloy experienced serious inventory discrepancies during the last few years of its existence, which were an ongoing problem that was never properly resolved.

47.     For example, in 2013, SpecAlloy discovered that inventory was misreported by $250,000.

48.     In response to that shortage, SpecAlloy instituted a policy that inventory would be counted on a monthly basis.  That policy was not followed, a failure for which Peluso, as president, is directly responsible.

49.     Instead, physical inventory was only taken twice a year and in response to audits by Heesung or Wells Fargo Bank.

50.     Peluso and Sanders were primarily in charge of inventory reporting and management.  Although Sanders reported to Peluso, Peluso failed to properly oversee Sanders and his work.

51.     In early 2014, Peluso oversaw the development and implementation of a new inventory management system named SharePoint.  The implementation was rushed and not properly tested, and the system never worked properly.  Peluso failed to ensure that the new

-8-

system would provide proper information to SpecAlloy's accounting department.

52.     In mid-2015, due to an audit by Heesung, SpecAlloy took a physical inventory, and a multi-million dollar inventory shortage was uncovered.  Sanders, while being overseen by Peluso, had been over-counting inventory and listing the same the books of SpecAlloy as well as the Affiliates.

53.     When Heesung discovered the significant overstatement of inventory on SpecAlloy's books, Heesung demanded control of SpecAlloy. If SpecAlloy did not accede to Heesung's demands, Heesung would have cut off funding, resulting in the closure of the SpecAlloy.

54.     Due in part to the highly inaccurate inventory reporting and other issues that were uncovered, Heesung abruptly terminated its relationship with SpecAlloy in December 2015, which led to SpecAlloy's rapid demise shortly thereafter.

**Insolvency**

55.     Historically, SpecAlloy was capitalized in an extremely thin manner.  For years, SpecAlloy needed to rely on cash infusions from Heesung to prop its finances up.  Despite this, SpecAlloy was insolvent from at least 2013 until the Petition Date.

56.     By June 2014 at the latest, Donovan was being regularly informed that SpecAlloy was out of money, and Donovan and Peluso were well aware that if Heesung did not continue to provide additional funding, SpecAlloy would immediately be out of money and forced to close its doors.

57.     In mid-July 2015, when Heesung became aware of SpecAlloy's inventory reporting issues, Heesung threatened to cut off funding, which would have immediately rendered SpecAlloy unable to pay its expenses as they came due.

-9-

58.     In sum, the Director and Officer Defendants plunged SpecAlloy into insolvency and placed SpecAlloy at the mercy of Heesung, which could immediately end SpecAlloy's ability to pay its debts as they came due on a moment's notice.

**Unwarranted Salaries and Bonuses**

59.     Peluso used the inaccurate financial reports—which showed that SpecAlloy was profitable when it was in fact insolvent—to justify giving himself and others large salary increases and bonuses.

60.     Peluso's salary was $80–85,000 annually in 2013 and went up to $100–125,000 in 2014.  In 2015, Peluso's annual salary was raised to $225,000, nearly triple what it was just two years prior, despite the fact that SpecAlloy was insolvent.

61.     In addition, Peluso received quarterly bonuses based on inaccurate financial reports.

62.     Peluso received salaries and bonuses while SpecAlloy was insolvent in amounts that were unjustifiably high and not equivalent to the services provided to SpecAlloy.

63.     According to SpecAlloy's bankruptcy schedules, in the year leading up to the Petition Date, Peluso received $189,153.73 in salary.[3]  Peluso knew, or should have known, that these amounts were entirely too high given SpecAlloy's financial condition.

64.     SpecAlloy paid this compensation through Agency.

**Peluso's Improper Transfers to Friends and Family**

65.     In or around 2014, SpecAlloy needed a new Human Resources Manager. Sanders began considering candidates and determined that $65,000 was an appropriate annual salary. Peluso then commanded that his wife, Ms. Peluso, would handle the staffing for that position.

---

[3] Peluso ceased being employed by SpecAlloy in the fall of 2015.

-10-

SpecAlloy wound up hiring an individual and paying her $85,000 annually.

66.     SpecAlloy paid Ms. Peluso $8,500 as a "headhunter" fee, which was in fact just an unnecessary kickback to Peluso's wife.  The individual that Ms. Peluso "recruited" was one of her longtime friends, and Ms. Peluso did not undertake an appropriate search for other candidates.

67.      Peluso also made unauthorized distributions to his friends. When he hired Ratner in 2011, Peluso caused SpecAlloy to pay Ratner $10,000 for his moving expenses, despite the fact that Ratner's actual moving expenses were a fraction of that amount.

68.     Similarly, Peluso overpaid an individual named Mickey Christo to relocate from Chicago and join SpecAlloy.  Christo also received overpayments in excess of $38,000 that he has never repaid.  According to SpecAlloy's bankruptcy schedules, Christo owed SpecAlloy $38,374.32 as of the Petition Date (collectively, with all other transfers received by Christo from SpecAlloy, the "Christo Transfers").

**Ratner's Background**

69.     Before being hired by SpecAlloy, Ratner had a checkered history, including a criminal background.  In 2008, Ratner pled guilty to a felony relating to the unregistered sale of securities.

70.     Peluso was aware of Ratner's criminal background before hiring him.

71.     Upon information and belief, Ratner received compensation from one or more of the suppliers in exchange for insuring that they received advances from SpecAlloy.  Many of those advances were never recovered.

**The Pelusos' Personal Expenses**

72.     Peluso caused SpecAlloy to loan him $65,000 in 2013 as a down-payment for his house (the "House Transfer"), which he and Ms. Peluso still own.   SpecAlloy received nothing

-11-

in exchange for these funds, which Peluso and Ms. Peluso have not repaid.

73.    Peluso also caused SpecAlloy to pay private school tuition for his children in an amount not less than $18,000 (the "Tuiton Transfer").  SpecAlloy received nothing in exchange for those payments, which Peluso and Ms. Peluso have not repaid.

74.    Peluso caused SpecAlloy to pay for a cell phone and related service for himself, Ms. Peluso, and their children.  SpecAlloy received nothing in exchange for those payments, which Peluso and Ms. Peluso have not repaid.

75.    Peluso caused SpecAlloy to purchase a 2014 Ford F-150 truck, make a number of payments, and then sign the title over to Peluso, who later sold the truck.  Peluso kept the proceeds of the sale for himself and did not repay any amounts to SpecAlloy.

76.    Peluso caused SpecAlloy to pay numerous other personal expenses, such as the purchase of a turkey gun, a laptop for Ms. Peluso, vacation travel expenses, and other personal expenses unrelated to SpecAlloy's business.  SpecAlloy received nothing in exchange for those payments, which Peluso has not repaid.

77.    According to SpecAlloy's statement of financial affairs, Peluso received $88,079.35 in expense reimbursements and other transfers during the year leading up to the Petition Date.

78.    According to SpecAlloy's bankruptcy schedules, Peluso owed SpecAlloy a total of $147,922.82 as of the Petition Date.  The Trustee seeks this amount, and more, through this lawsuit (collectively, with the House Transfer, the Tuition Transfer, and all other amounts received by Peluso from SpecAlloy and its affiliates, the "Peluso Transfers").

**Payroll Advances**

79.    As of the Petition Date, numerous employees had received payroll advances from

SpecAlloy, totaling $21,563.95, despite the fact that SpecAlloy was insolvent at that point.

80.    As President of SpecAlloy, Peluso never should have permitted payroll advances of this nature given the company's financial condition.

**Advances to Suppliers**

81.    Ratner and Peluso authorized SpecAlloy to advance funds to suppliers without evidence of the suppliers' creditworthiness and few safeguards to ensure repayment.

82.    As a result of the Director and Officer Defendants' mismanagement, inadequate oversight, and failure to exercise due care, SpecAlloy became reckless in its credit policies and advanced funds to its suppliers that would never be repaid.

83.    Because they were made without appropriate safeguards, those advances hastened SpecAlloy's descent into bankruptcy and deprived it of assets that would have otherwise been available for distribution to creditors.

84.    According to SpecAlloy's bankruptcy schedules, it had advanced funds to suppliers with a net total of $2,224,766.11 as of the Petition Date.  These losses could have been avoided had the Director and Officer Defendants taken steps to insure that the loans were secured, or that the suppliers were creditworthy.

**Panhandle Converter & Core, LLC**

85.    Peluso, Donovan, and an individual named Michael Hronchek ("Hronchek") set up a side business, Panhandle Converter & Core, LLC ("PC&C") that was intended to profit at SpecAlloy's expense.

86.    In establishing and funding this side business, Peluso was breaching his duties to SpecAlloy, both because he had a conflict between the interests of SpecAlloy and those of PC&C and because he did not take reasonable steps to insure that PC&C would provide value to

SpecAlloy.

87.     PC&C was to supply converters to SpecAlloy, with any profits of those transactions going to PC&C, rather than to SpecAlloy, despite Peluso and Donovan's ownership interests and directorships at SpecAlloy.   This presented a fundamental conflict of interest between the interests of SpecAlloy and its creditors and Peluso and Donovan's personal interests in PC&C.

88.     PC&C ended up being a severe financial drain on SpecAlloy.   SpecAlloy extended over one million dollars in credit and funding to or for the benefit of PC&C, which was never repaid (collectively, the "PC&C Transfers").  The balance of the PC&C advances that had not been repaid as of the Petition Date was not less than $1,542,891.[4]

89.     Morever, Peluso and Donovan also caused Agency to fund the salary of Hronchek at the rate of $150,000 per year, as well as the salaries of several other employees who worked not for SpecAlloy but for PC&C.  Agency received cash to fund these salaries from SpecAlloy.

90.     SpecAlloy received no consideration for the payment of Hronchek's salary (together with all other transfers from SpecAlloy or Agency to Hronchek, the "Hronchek Transfers").

**Peluso's Father & Vineyard Church**

91.     Peluso's father, Lyle Peluso, Sr., is the founder and pastor of the Dothan Vineyard Church ("Vineyard").

92.     Peluso caused SpecAlloy to transfer not less than $155,415.28 to Vineyard (together with all other transfers to Vineyard and Peluso, Sr., the "Vineyard Transfers") during the two years prior to the Petition Date for no consideration.

---

[4] The Trustee reserves all rights against Hronchek, other employees of PC&C and SpecAlloy.

-14-

93.     SpecAlloy was in no financial condition to be making transfers of this nature.

94.     Peluso knew, or should have known, that SpecAlloy could not afford transfers of this nature.

## COUNT I – BREACH OF FIDUCIARY DUTY OF CARE

95.     The Trustee realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

96.     Under Alabama law, the Director and Officer Defendants owed a duty to exercise reasonable care, skill, and diligence in fulfilling their responsibilities, which required them to exercise the care and skill reasonably expected from persons having their knowledge, expertise, and experience in the industry.  Because SpecAlloy was either insolvent or in the zone of insolvency at all relevant times, the Director and Officer Defendants were bound to act in the best interest of SpecAlloy and its creditors.

97.     In undertaking their duties and implementing their business plan, the Director and Officer Defendants undertook several courses of action that were negligent, grossly negligent, or reckless.  Despite the Debtor's perilous financial condition and lack of solvency, the Director and Officer Defendants intentionally and/or recklessness disregarded and ignored the risks and consequences (or did not consider the risks and consequences) of the failure to maintain accurate and appropriate financial records, accounting systems and internal controls (which led to millions of dollars in losses), the Peluso Transfers, the transfers to Suppliers, the PC&C Transfers, the Hronchek Transfers, the Christo Transfers, the Vineyard Transfers, the approval and payment of the Compensation, the prolonged operation of the Debtors while they were heavily insolvent for the primary benefit of Heesung, and the other actions or inactions described herein.  Nor did the Director and Officer Defendants consider or undertake available alternative

-15-

transactions or other courses of action that would not have unduly risked or jeopardized the recovery of SpecAlloy's creditors or the financial viability of SpecAlloy.  The Director and Officer Defendants' negligence, gross negligence, or recklessness caused loss and damage to SpecAlloy of up to $20 million.

98.     Due to the Director and Officer Defendant's conflicts of interest, the business judgment rule does not apply.

## COUNT II – BREACH OF FIDUCIARY DUTY OF LOYALTY

99.     The Trustee realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

100.    The Director and Officer Defendants owed a fiduciary duty of loyalty, which included, among other things, a duty to act honestly and in the best interest of the beneficiaries, to avoid conflicts between their personal interests and beneficiaries' interests, to exercise their power for a proper purpose, and not to fetter their discretion.  Because SpecAlloy was insolvent at all times relevant to this Complaint, the Director and Officer Defendants were bound to act in the best interests of SpecAlloy and its creditors.

101.    In undertaking their duties and implementing their business plan, the Director and Officer Defendants undertook several courses of action that were negligent, grossly negligent, or reckless.  Despite the Debtor's perilous financial condition and lack of solvency, the Director and Officer Defendants intentionally and/or recklessness disregarded and ignored the risks and consequences (or did not consider the risks and consequences) of the failure to maintain accurate and appropriate financial records, accounting systems and internal controls (which led to millions of dollars in losses), the Peluso Transfers, the transfers to Suppliers, PC&C Transfers, the Hronchek Transfers, the Christo Transfers, the Vineyard Transfers, the approval and payment of the Compensation, the prolonged operation of the Debtors while they were heavily insolvent

-16-

for the primary benefit of Heesung, and the other actions or inactions described herein.  Nor did the Director and Officer Defendants consider or undertake available alternative transactions or other courses of action that would not have unduly risked or jeopardized the recovery of SpecAlloy's creditors or the financial viability of SpecAlloy.  The Director and Officer Defendants' negligence, gross negligence, or recklessness caused loss and damage to SpecAlloy of up to $20 million.

102.    Due to the Director and Officer Defendant's conflicts of interest, the business judgment rule does not apply.

### COUNT III – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

103.    The Trustee realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

104.    The elements of a cause of action for aiding and abetting are: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Lawrence v. Bank of America*, 455 F. App'x 904, 906-07 (11th Cir. 2012) (citing *AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991) and *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So. 2d 368, 372 (Fla. 5th Dist. Ct. App. 2005)).

105.    In undertaking their duties and implementing their business plan, the Director and Officer Defendants undertook several courses of action that were negligent, grossly negligent, or reckless.  Despite the Debtor's perilous financial condition and lack of solvency, the Director and Officer Defendants intentionally and/or recklessness disregarded and ignored the risks and consequences (or did not consider the risks and consequences) of the failure to maintain accurate and appropriate financial records, accounting systems and internal controls (which led to

-17-

millions of dollars in losses), the Peluso Transfers, the transfers to Suppliers, PC&C Transfers, the Hronchek Transfers, the Christo Transfers, the Vineyard Transfers, the approval and payment of the Compensation, the prolonged operation of the Debtors while they were heavily insolvent for the primary benefit of Heesung, and the other actions or inactions described herein.  Nor did the Director and Officer Defendants consider or undertake available alternative transactions or other courses of action that would not have unduly risked or jeopardized the recovery of SpecAlloy's creditors or the financial viability of SpecAlloy.   The Director and Officer Defendants' negligence, gross negligence, or recklessness caused loss and damage to SpecAlloy of up to $20 million.

106.   Ms. Peluso was aware that her husband, Peluso, was breaching his duties to SpecAlloy in arranging for her to receive a "headhunter" fee and an inflated salary for her friend. Ms. Peluso substantially assisted Peluso in this regard.

107.   Christo was aware that Peluso was breaching his duties to SpecAlloy in arranging for the Christo Transfers.  Christo substantially assisted Peluso in this regard.

### COUNT IV – LIABILITY FOR UNLAWFUL DISTRIBUTIONS
### (FLA. STAT. ANN. § 607.0834)

108.   The Trustee realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

109.   SpecAlloy made payments to or for the benefit of the Donovan, Peluso, and Christo that constitute unlawful distributions under Fla. Stat. Ann § 607.0834.  These unlawful distributions include, without limitation, the amounts paid to or for the Compensation, payroll advances, and all other transfers to insiders.

110.   These distributions were illegal when paid because SpecAlloy did not have a surplus or net profits from which dividends could be lawfully paid, and was insolvent or

rendered insolvent as a result of the transactions.   At the time the dividends were paid, SpecAlloy's total liabilities exceeded its total assets.

111.   Peluso is liable for these transfers as they were in violation of Fla. Stat. Ann § 607.0834.  Peluso was a director who assented to the unlawful distributions.

112.   Peluso knew or should have known that SpecAlloy did not have a surplus or net profits from which dividends could be lawfully paid.

113.   SpecAlloy and its creditors were damaged as a result of these distributions.

### COUNT V – FRAUDULENT TRANSFERS (11 U.S.C. §§ 544(B), 550 AND 551 AND ALA. CODE § 8-9A-4 *et seq.*)

### (Peluso, Ms. Peluso, Christo, and Agency – Actual Fraud)

114.   The Trustee realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

115.   The Debtor made transfers to or incurred obligations for the benefit of Peluso on or within four years of the Petition Date.  These fraudulent transfers include, but are not limited to, the Peluso Transfers and the Christo Transfers.   For the avoidance of doubt, the Trustee is seeking to recover all transfers made by SpecAlloy to or for the benefit of Peluso and Ms. Peluso, even if they were routed through one or more individuals or entities prior to their receipt by Peluso or Ms. Peluso.

116.   The Debtor paid the Peluso Transfers and the Christo Transfers with actual intent to hinder, delay, or defraud creditors.

117.   The Debtor's actual intent is evidenced by, without limitation, the following badges of fraud:

a) the Debtor was insolvent at the time of the payment of the Peluso Transfers and the Christo Transfers;

b) the Peluso Transfers were paid to an insider of the Debtor who had the ability to set his own salary and was aware of the financial peril the Debtor was facing;

c) each of the recipients of the Peluso Transfers and the Christo Transfers were aware of the Debtor's insolvency, debt structure, and inability to recover;

d) the Peluso Transfers and the Christo Transfers were paid occurred shortly before or shortly after a substantial debt was incurred;

e) the Peluso Transfers and the Christo Transfers were unreasonably large in light of the quality or amount of the services rendered;

f) certain portions of the Peluso Transfers and the Christo Transfers were hidden or concealed.

118.    The Peluso Transfers and the Christo Transfers are recoverable from Peluso, Ms. Peluso, and Christo pursuant to 11 U.S.C. § 550.[5]

### COUNT VI – FRAUDULENT TRANSFERS (11 U.S.C. §§ 544(B), 550 AND 551 AND ALA. CODE § 8-9A-4 & 8-9A-5 *et seq.*)

### (Peluso, Ms. Peluso, Christo, and Agency – Constructive Fraud)

119.    The Trustee realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

120.    The Debtor made transfers to or incurred obligations for the benefit of Peluso, Ms. Peluso, and Christo on or within four years of date of the Petition Date.  These fraudulent transfers or obligations include, but are not limited to the Peluso Transfers and the Christo Transfers.

121.    The Debtors did not receive reasonably equivalent value in exchange for the Peluso Transfers and the Christo Transfers because the services purportedly provide for

---

[5] Agency is named in this count and Count VI as it was the entity through which the compensation flowed.

exchange for same were either non-existent, small in relation to same, or actually served to harm the Debtor. At the time the transfers constituting the Peluso Transfers and the Christo Transfers were made, the Debtor (a) was engaged in a business or a transaction, or was about to engage in a business or transaction, for which the assets remaining with the Debtor were unreasonably small in relation to the business or transaction and/or (b) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured and/or (c) were insolvent or became insolvent as a result of the transfers.

122.    The Peluso Transfers and the Christo Transfers are recoverable from Peluso, Ms. Peluso, and Christo, respectively, pursuant to 11 U.S.C. § 550.

## PRAYER FOR RELIEF

Based on the foregoing, the Trustee requests that the Court enter an order awarding the Trustee all actual and consequential damages against the Defendants, including pre- and post-judgment interest, court costs, avoidances of the transfers outlined herein, recovery of all amounts transferred to or for the benefit of Defendants, punitive and/or treble damages based upon the torts and other claims alleged herein, an award of attorneys' fees, and all such other relief that the Trustee is entitled to under law and equity.

Respectfully submitted this 4th day of January, 2018.

GREENBERG TRAURIG, LLP

_____/s/  John D. Elrod_____
John D. Elrod, ASB-5138-H59E
Benjamin R. Keck (*pro hac vice* motion pending)
Terminus 200, Suite 2500
3333 Piedmont Road, NE
Atlanta, Georgia 30305
(678) 553-2100
elrodj@gtlaw.com
keckb@gtlaw.com
*Counsel for Plaintiff William C. Carn,*
*as Chapter 7 Trustee of SpecAlloy Corporation*

-21-